**No. 2023-1768**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

CA, INC.,

*Appellant*

v.

NETFLIX, INC.,

*Appellee*

---

Appeal from the United States Patent and Trademark Office
Patent Trial and Appeal Board
No. IPR2021-01319

---

# RESPONSE BRIEF OF APPELLEE NETFLIX, INC.

---

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Harper Batts
*hbatts@sheppardmullin.com*
Christopher Ponder
*cponder@sheppardmullin.com*
Jeffrey Liang
*jliang@sheppardmullin.com*
1540 El Camino Real, Suite 120
Menlo Park, CA 94025
Telephone: (650) 815-2600

Jonathan DeFosse
*jdefosse@sheppardmullin.com*
2099 Pennsylvania Ave., N.W.
Suite 100
Washington, DC 20006
Telephone: (202) 747-1900

Counsel for Appellee Netflix, Inc.

## PATENT CLAIMS AT ISSUE

This appeal concerns claims 1, 3-9, and 11-17 (the "Challenged Claims") of U.S. Patent No. 7,103,794 (the "'794 Patent"). Independent claims 1 and 17 are representative for purposes of the issues on appeal and are reproduced below.

1. A method, including steps of:

receiving a set of network objects in response to a first request to a server from a client; and

maintaining said network objects in a cache memory in a cache engine, said cache engine connected via a network to the server and the client, said cache memory including mass storage;

wherein said step of maintaining includes steps of recording said network objects in said cache memory and retrieving said network objects from said cache memory, so as to substantially minimizes a time required for retrieving said network objects from said mass storage.

17. A method, including steps of:

receiving a set of network objects in response to a first request to a server from a client; and

maintaining said network objects in a cache memory in a cache engine, said cache engine connected via a network to the server and the client, said cache memory including mass storage;

wherein said step of maintaining is performed independently of a file system for said mass storage.

# CERTIFICATE OF INTEREST

Counsel for Appellee Netflix, Inc. certifies the following information is accurate and complete to the best of my knowledge:

**1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). Provide the full names of all entities represented by undersigned counsel in this case.

Netflix, Inc.

**2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

Netflix Streaming Services, Inc.

**3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

None.

**5. Related Cases**. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

Yes.

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information**. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.4(a)(4).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None.

Dated: November 27, 2023

*/s/ Harper Batts*

Harper Batts
SHEPPARD MULLIN
RICHTER & HAMPTON LLP
1540 El Camino Real, Suite 120
Menlo Park, CA 94025

# TABLE OF CONTENTS

Page


I. INTRODUCTION ........ 1

II. STATEMENT OF THE ISSUES ON APPEAL ........ 2

III. STATEMENT OF THE CASE ........ 3

A. Overview of the ’794 patent ........ 3

B. Representative Claims of the ’794 Patent ........ 5

C. Procedural history ........ 6

1. CA accuses Netflix of infringing the ’794 patent ........ 6

2. Netflix files a petition for *inter partes* review ........ 7

a. Netflix relies on Medin for the “receiving” and “maintaining” steps of the challenged claims ........ 7

b. Netflix relies on the combination of Medin and Seltzer for minimizing the time required to retrieve objects from mass storage ........ 10

c. Netflix relies on the combination of Medin and Markatos for maintaining objects independently of the mass storage file system ........ 13

3. The Board institutes review and finds all challenged claims invalid ........ 15

a. The Board rejects CA’s attempt to import a volatile memory requirement into the claims ........ 15

b. The Board finds it would have been obvious to combine the teachings of Medin and Seltzer ........ 18

c. The Board finds the combination of Markatos and Medin teaches maintaining network objects in a cache memory independent of the mass storage file system ........ 20

IV. SUMMARY OF THE ARGUMENT ........ 22

V. ARGUMENT ........ 24

A. Standard of Review ........ 24

B. The Board correctly construed “cache memory” ........ 25

1. The Board did not eliminate "memory" from the claims .........25

2. The claims support the Board's construction ...........................26

3. The written description supports the Board's construction ......28

4. The specification does not support construing "cache memory" to require volatile memory.......................................31

   a. Examples of "memory" from the specification do not define or limit "cache memory" ...............................31

   b. The specification does not redefine or disavow the ordinary scope of "memory" ........................................32

   c. CA cannot read limitations into the claims from exemplary embodiments................................................35

5. Prosecution history confirms that the '794 patent uses "memory" according to its ordinary memory ...........................37

6. Extrinsic evidence refutes CA's assertions concerning the ordinary meaning of "memory" ...............................................38

7. Netflix did not define "cache memory" to require volatile memory ..........................................................................40

C. Substantial Evidence Supports the Final Written Decision under Any Construction of "Cache Memory".............................................41

1. The Court may consider the alternative ground for affirming the Board's decision.................................................41

2. The combination of Medin and Seltzer teaches maintaining sets of network objects in both mass storage and buffer memory....................................................................43

3. The combination of Medin and Markatos teaches maintaining sets of network objects in both volatile memory and mass storage........................................................45

D. The Board Correctly Found a Motivation to Combine Medin and Seltzer ...........................................................................46

1. CA applies the wrong standard of review.................................47

2. Substantial evidence supports the Board's finding of a motivation to combine ...........................................................48

a. The teachings of Medin and Seltzer are "specifically complimentary" ........................................49

b. Seltzer's techniques are well-suited for web caching ........................................51

E. The Board Correctly Found that the Combination of Medin and Markatos Teaches Maintaining Network Objects Independently of a File System for Mass Storage ........................................53

1. Claim 17 requires maintaining "a set of network objects" independently of a mass storage file system........................................54

2. CA's interpretation of claim 17 contradicts the specification and the position CA advanced in the district court........................................56

3. Substantial evidence supports the Board's finding that Markatos teaches maintaining a set of network objects independently of a mass storage file system........................................58

VI. CONCLUSION........................................60

CERTIFICATE OF COMPLIANCE........................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acoustic Tech., Inc. v. Itron Networked Sols., Inc.*
949 F.3d 1360 (Fed. Cir. 2020) ....................................................................59

*Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*
825 F.3d 1373 (Fed. Cir. 2016) ....................................................................47

*Aventis Pharma S.A. v. Hospira, Inc.*
675 F.3d 1324 (Fed. Cir. 2012) ....................................................................36

*Azure Networks, LLC v. CSR PLC*
771 F.3d 1336 (Fed. Cir. 2014) ..............................................................33, 34

*Bradium Techs. LLC v. Iancu*
923 F.3d 1032 (Fed. Cir. 2019) ..............................................................28, 35

*Hyperphrase v. Google*
260 F. Appx. 274 (Fed. Cir. 2008) ................................................................43

*IGT v. Bally Gaming International, Inc.*
659 F.3d 1109 (Fed. Cir. 2011) ....................................................................32

*Imaginal Systematic, LLC v. Leggett & Platt, Inc.*
805 F.3d 1102 (Fed. Cir. 2015) ....................................................................26

*Intel Corp. v. Qualcomm Inc.*
21 F.4th 801 (Fed. Cir. 2021) .......................................................................24

*IXI IP, LLC v. Samsung Elecs. Co.*
903 F.3d 1257 (Fed. Cir. 2018) ..............................................................24, 25

*Kemco Sales, Inc. v. Control Papers Co.*
208 F.3d 1352 (Fed. Cir. 2000) ....................................................................27

*Lexington Luminance LLC v. Amazon.com Inc.*
601 Fed. Appx. 963 (Fed. Cir. 2015)...............................................................30

*Liebel-Flarsheim Company v. Medrad, Inc.*
358 F.3d 898 (Fed. Cir. 2004) ......................................................................36

*Lifestyle Enter., Inc. v. United States*
751 F.3d 1371 (Fed. Cir. 2014) .....................................................................42

*Luminara Worldwide, LLC v. Liown Electronics Co.*
814 F.3d 1343 (Fed. Cir. 2016) .....................................................................34

*Network Commerce, Inc. v. Microsoft Corp.*
422 F.3d 1353 (Fed. Cir. 2005) .....................................................................32

*Nevro Corp. v. Bos. Sci. Corp.*
955 F.3d 35 (Fed. Cir. 2020) .........................................................................34

*Oatey Co. v. IPS Corp.*
514 F.3d 1271 (Fed. Cir. 2008) .....................................................................30

*Outdry Techs. Corp. v. Geox S.p.A.*
859 F.3d 1364 (Fed. Cir. 2017) .....................................................................47

*Par Pharmaceutical, Inc. v. TWi Pharmaceuticals, Inc.*
773 F.3d 1186 (Fed. Cir. 2014) .....................................................................47

*Phillips v. AWH Corp.*
415 F.3d 1303 (Fed. Cir. 2005) ...............................................................28, 36

*Propellex Corp. v. Brownlee*
342 F.3d 1335 (Fed. Cir. 2003) .....................................................................42

*Redline Detection, LLC v. Star Envirotech, Inc.*
811 F.3d 435 (Fed. Cir. 2015) .......................................................................59

*Smith & Nephew, Inc. v. Hologic, Inc.*
721 Fed. Appx. 943 (Fed. Cir. 2018)..............................................................34

*Software Rights Archive, LLC v. Facebook, Inc.*
659 Fed. Appx. 627 (Fed. Cir. 2016)..............................................................56

*In re Stepan*
868 F.3d 1342 (Fed. Cir. 2017) .....................................................................24

*Teleflex, Inc. v. Facias North America Corp.*
299 F.3d 1313 (Fed. Cir. 2002) .....................................................................42

*Thorner v. Sony Computer Entertainment LLC*
669 F.3d 1362 (Fed. Cir. 2012) ....................................................................34, 36

*Unwired Planet, LLC v. Google Inc.*
841 F.3d 995 (Fed. Cir. 2016) ..........................................................................56

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rules 28(a)(4) and 47.5, Appellee states that to the best of its knowledge:

1. No appeal from the same trial court actions or proceedings was previously before this or any other appellate court.

2. The ’794 patent is being asserted by CA, Inc. against Netflix, Inc. in Case No. 3:22-cv-0373-EMC (N.D. Cal.). There are no other cases pending in any other court or tribunal that will directly affect or be directly affected by this Court’s decision in this appeal.

# I. INTRODUCTION

The arguments that Appellant CA, Inc. raises on appeal suffer the same flaws that the Board identified in its final written decision ("FWD"). CA argues primarily that the Board erred in construing the term "cache memory." In particular, the Board held that the claimed "cache memory" must include mass storage because the claims expressly recite "said cache memory including mass storage." Appx9-10. The Board held that the claimed "cache memory" may also permissively include other types of memory, but those other types of memory are not required. *Id*. On appeal, CA reprises its position that "cache memory" must include **volatile memory**. CA advances the same rationale presented to the Board—that the word "memory" refers "exclusively" to volatile memory and, as such, "cache memory" must include volatile memory. But the Board correctly identified the glaring flaw in CA's argument: "nothing in the Specification limits 'memory'—much less 'cache memory'—to RAM or volatile memory." Appx9. To the contrary, the claims expressly state that "cache memory" includes "mass storage," which is a form of **nonvolatile** memory. *See* Appx45 (claims 1, 17).

CA also repeats the arguments raised before the Board that (i) an ordinary artisan would not have had a motivation to combine Medin and Seltzer; and (ii) the combination of Medin and Markatos fails to teach elements of challenged claim

17. CA, however, disregards the standard for review related to these arguments. Rather than arguing that the Board's factual findings lack substantial evidence, CA asks the Court to re-weigh the evidence and second-guess the factual determinations of the Board. CA's arguments lack merit and the FWD should be affirmed.

## II. STATEMENT OF THE ISSUES ON APPEAL

1. Whether the Board correctly held that "cache memory" does not require volatile memory where (i) the claims expressly describe "cache memory" as "including mass storage"; (ii) conversely, the claims do not state that "cache memory" must include volatile memory; and (iii) CA's construction seeks to improperly import a limitation into the claims from exemplary embodiments in the specification.

2. Whether the final written decision should be affirmed regardless of the construction of "cache memory" given that the cited prior art combinations undisputedly teach maintaining network objects in both volatile memory and mass storage.

3. Whether substantial evidence supports the Board's finding that an ordinary artisan would have been motivated to combine the teachings of Medin and Seltzer given that Medin teaches storing data on UNIX-based computers and

Seltzer teaches a method of optimizing the data storage systems of UNIX-based computers.

4. Whether substantial evidence supports the Board's finding that the combination of Medin and Markatos teaches maintaining a set of network objects in cache memory "independently of a file system for said mass storage" where Markatos teaches that popular network objects are stored in main memory to avoid using the mass storage file system.

## III. STATEMENT OF THE CASE

### A. Overview of the '794 patent

The '794 patent is directed to network caching—locally storing copies of data transmitted over a computer network (e.g., text, graphics, audio, video) to improve the performance of the network. Appx37 (1:6-7), Appx39 (6:30-35). According to the '794 patent, network caching systems were known in the prior art, but suffered poor performance due to the manner in which information was maintained in the cache. Appx37 (1:27-57). For example, the '794 patent states that prior art systems were "unable to organize the information from the server in its mass storage for rapid access." Appx37, 1:42-49; *see also* Appx713 (¶32). The '794 patent also states that using a local file system to store network objects was associated with "significant overhead." Appx37, 1:35-41.

The ’794 patent purports to improve on prior art network caching systems by optimizing the manner in which objects are maintained in the cache. Appx37 (1:62-67, 2:6-13); *see also* Appx713, ¶33. In one embodiment, the ’794 patent proposes techniques “to optimize the times and locations when and where the blocks 200 are written to disk, so as to minimize time and space required to write and read from disk.” Appx41 (10:37-40); *see also* Appx37 (2:6-13), Appx42 (12:35-60), Appx43 (14:4-17); Appx713 (¶33), Appx717-718 (¶¶40-41). For example, the ’794 patent proposes writing data to “sequential free storage blocks (if possible, contiguous free storage blocks) on one of the disk drives … so as to enable reading the related data blocks 200 in the same read operation whenever possible.” Appx42 (12:49-54). According to the ’794 patent, “[t]his allows for faster operation of the mass storage 104 because a set of disk heads for the mass storage 104 must move only relatively a small distance during each write episode.” Appx718-720 (¶¶42-44).

In another embodiment, the ’794 patent proposes bypassing the overhead associated with a file system by maintaining a subset of frequently-accessed network objects in volatile memory (such as RAM): “A subset of the blocks 200 are maintained in the memory 103, so as to use the memory 103 as a cache for the mass storage 104.” Appx40 (8:9-13); *see also* Appx38 (4:9-14); Appx41 (10:17-29); Appx718-720 (¶¶43-44).

### B. Representative Claims of the '794 Patent

The parties agree that claims 1 and 17 of the '794 patent are representative for the purposes of this appeal. The preamble and first two limitations of those claims are identical:

> A method, including steps of:
>
> receiving a set of network objects in response to a first request to a server from a client; and
>
> maintaining said network objects in a cache memory in a cache engine, said cache engine connected via a network to the server and the client, said cache memory including mass storage;

Appx45 (claims 1, 17).

Claims 1 and 17 go on to recite "wherein" clauses that provide different ways of performing the "maintaining" step. In claim 1, the "wherein" clause is directed to recording and retrieving objects in a manner that improves the performance of the mass storage:

> wherein said step of maintaining includes steps of recording said network objects in said cache memory and retrieving said network objects from said cache memory, so as to substantially minimizes a time required for retrieving said network objects from said mass storage.

Appx45 (17:12-16). Claim 1 thus encompasses, for example, embodiments of the '794 patent that optimize the operation of mass storage by recording objects to and

retrieving objects from contiguous blocks of the mass storage to reduce writing and retrieval times. *See, e.g.,* Appx42 (12:49-54) *and* Appx44 (15:55-65).

While claim 1 is directed to the way objects are recorded to and retrieved from mass storage, claim 17 is directed to avoiding the overhead associated with the mass storage file system by maintaining sets of network objects independently of the file system:

> wherein said step of maintaining is performed
> independently of a file system for said mass storage.

Appx45 (18:17-18). Claim 17 thus encompasses, for example, embodiments of the ’794 patent where the system maintains certain frequently-accessed objects in random access memory, thereby avoiding the overhead associated with the mass storage file system. *See* Appx38 (4:9-14), Appx40 (8:9-13), Appx41 (10:25-29).

### C. Procedural history

#### 1. CA accuses Netflix of infringing the ’794 patent

On March 9, 2021, CA filed a complaint accusing Netflix of infringing the ’794 patent. CA alleged that Netflix “substantially minimizes a time required for retrieving said network objects from mass storage” (claim 1) because Netflix stores content on servers that are located in geographic proximity to end users.[1]

---

[1] There is no indication that claim 1 was intended to encompass merely storing network objects in geographic proximity to end users. To the contrary, storing objects “locally” is a fundamental principle underlying network caching generally, including the proxy systems identified as prior art in the ’794 patent (Appx37 (1:27-41)). *See, e.g.*, Appx1052 (“The basic idea of caching is simple: store the

Appx3057-3059. CA alleged that Netflix maintains network objects "independently of a file system for said mass storage" (claim 17) because Netflix saves frequently-accessed files to virtual memory rather than constantly fetching those files from disk. Appx3085-3087.

#### 2. Netflix files a petition for *inter partes* review

Netflix filed a Petition seeking *inter partes* review of claims 1, 3-9, and 11-17 of the '794 patent. The Petition asserted two grounds of unpatentability: (i) that claims 1, 3-9, and 11-16 are obvious based on the combination of Medin and Seltzer; and (ii) that claim 17 is obvious based on combination of Medin and Markatos.

##### a. Netflix relies on Medin for the "receiving" and "maintaining" steps of the challenged claims

Netflix argued that Medin teaches the "receiving" and "maintaining" steps common to claims 1 and 17. Appx81-89, Appx111-112. Medin is directed to a system for caching network objects that end users request from servers over the Internet. *See* Appx50 (Abstract). Netflix's expert—Dr. Henry Houh—described the architecture of Medin's system using an annotated version of FIG. 1:

---

retrieved document into a local file for further use so it won't be necessary to connect to the remote server the next time a document is requested.")



FIG. 1

*See* Appx65-66; Appx743-744 (¶94).

Medin teaches that the remote LAN servers (colored in blue, above) are "part of the publicly accessible Internet" and may include various servers that provide content, including video content, such as the CNN and ESPN web servers. Appx866 (4:11-24, 4:59-64), Appx870 (11:27-34, 12:24-34). Dr. Houh explained that Medin teaches the "receiving" step of claims 1 and 17 because Medin's caching system receives sets of network objects from the LAN servers (blue) in response to the first requests for those objects submitted by end users (colored in

green, above). Appx744-745 (¶95). Dr. Houh explained that Medin also teaches maintaining the received network objects in cache memory at two locations—regional data centers ("RDCs") and local head-ends ("HEs") (both colored in orange, above). Appx865 (2:54-58); Appx870 (11:21-12:17), Appx862 (FIG. 11); *see also* Appx744-747 (¶¶95-97). When end users make subsequent requests for the same content, the objects are served directly from the caching servers without going to the Internet servers. Appx870 (11:21-12:17), Appx862 (FIG. 11); Appx746 (¶97). Medin teaches that this system "more efficiently fulfills multiple requests for the same content" because "the often slow and unreliable Internet is bypassed for all but the first request" for content. Appx870 (11:40-45, 11:55-60); *see also* Appx744-746 (¶¶95-97).

Consistent with claims 1 and 17, Dr. Houh explained that the cache memory of Medin "includ[es] mass storage." In particular, the servers at the RDCs maintain network objects on a disk array, while the servers at the HEs maintain network objects on a "cache storage device." Appx854-857 (FIGS. 3-6), Appx870 (11:67, 12:15-16). The parties agreed that Medin's "cache storge device" is a mass storage device. Appx85, Appx88, Appx2775, Appx2784.

#### b. Netflix relies on the combination of Medin and Seltzer for minimizing the time required to retrieve objects from mass storage

For the "wherein" limitation of claim 1, Dr. Houh explained that it would have been obvious to combine the teachings of Medin and Seltzer. Appx754-760 (¶¶113-121), Appx779-792 (¶¶152-163).

Dr. Houh first explained that Medin teaches caching content in mass storage using UNIX-based computers. *See* Appx868 (7:46-8:2, 8:63-9:19); Appx754-755 (¶114). But Medin does not include specific details on how the UNIX-based computers record objects to and retrieve objects from the mass storage. *Id*. Seltzer specifically teaches techniques to optimize the manner in which UNIX-based computers record and retrieve data. Appx68; Appx881; Appx747 (¶99); Appx868-869 (7:46-8:2, 8:63-9:19). More specifically, Seltzer teaches that the UNIX-based computers can use a log-structured file system ("LFS") that optimizes the recording and retrieval of files to improve file system performance. Like the '794 patent, Seltzer explains that LFS optimizes writing and reading files by storing data contiguously on disk:

> The fundamental idea of LFS is to improve file system performance by storing all file system data in **a single, continuous log**. Such a file system is **optimized for writing**, **because no seek is required between writes**. It is also **optimized for reading files** written in their entirety over a brief period of time (as is the norm in UNIX systems), because **the files are placed contiguously on disk**. Finally, it provides temporal locality, in that it is

> optimized for accessing files that were created or modified at approximately the same time.

Appx68 (emphasis added); *compare id. with* Appx42 (12:49-54); *see also* Appx747-748 (¶¶99-101).

Seltzer teaches that recording "related information close together on the disk" will "dramatically" improve file system performance by reducing "the number and length of seeks." Appx94, Appx881; *see also* Appx736-737 (¶77); *compare id. with* Appx42 (12:49-54) *and* Appx44 (15:55-65) ('794 patent statements concerning contiguous storage blocks and reducing seek).

Dr. Houh explained that Seltzer also teaches using "staging buffers" to optimize the performance of mass storage by organizing data before it is written to disk. Appx782 (¶150), Appx786-787 (¶157). Pursuant to this technique, data is first recorded in volatile memory and later retrieved from volatile memory as part of the process of writing the data to disk. Appx885; *see also* Appx883 ("When writing, LFS gathers many dirty pages and prepares to write them to disk sequentially in the next available segment."), Appx889-890, Appx894; Appx782 (¶150).

Dr. Houh explained that an ordinary artisan would have been motivated to apply Seltzer's teachings to the system of Medin for several reasons. Appx754-760 (¶¶113-121). As a threshold matter, Medin and Seltzer are both specifically directed to systems for storing and retrieving data. Appx754-756 (¶¶113-115).

Seltzer expressly teaches techniques to improve the performance of UNIX-based computers such as those used to store objects in Medin. Appx755-756 (¶115). Dr. Houh explained that an ordinary artisan would have understood that Seltzer's storage and retrieval techniques would have furthered the specific goal of Medin of delivering data to end users more efficiently and rapidly. Appx758-759 (¶119). Dr. Houh also explained that an ordinary artisan would have found Seltzer's techniques to be particularly well-suited to storing the web content at issue in Medin because Seltzer's techniques: (i) are specifically designed to support high transaction rates such as those experienced over the Internet (Appx759 (¶120), Appx3182-3185 (¶16)); and (ii) enable all of the "inline" objects associated with a webpage (e.g., images, audio, video, JavaScript, applets) to be stored and quickly retrieved together by writing them contiguously to disk (Appx3182-3185 (¶16)). In support of the combination, Dr. Houh also cited other prior art recognizing that storing objects contiguously on disk was "particularly useful for repositories whose primary function is to disseminate information, such as the World-Wide-Web." Appx3182-3185 (¶16) (citing Appx949).

### c. Netflix relies on the combination of Medin and Markatos for maintaining objects independently of the mass storage file system

For the "wherein" limitation of claim 17, Dr. Houh explained that it would have been obvious to combine the teachings of Medin and Markatos. Appx806-812 (¶¶188-198).

Dr. Houh first explained that Medin teaches the servers at the RDCs and HEs have both mass storage and volatile memory. Appx776-777 (¶143). But Medin does not specifically discuss using the volatile memory (as opposed to the mass storage) to cache network objects. Markatos, however, teaches improving the operation of Internet servers by storing frequently-accessed objects in volatile memory independently of the file system for the mass storage:

> In this paper we propose and explore Main Memory Caching of frequently requested Web documents on the Web server's memory. That is, if a document is frequently accessed, then it is kept in the Main Memory Cache, inside the Web server's address space. **The server accesses its own cache directly, without any help from the file system. When a client requests a document that resides in the server's main memory cache, the document is directly read from the server's cache and sent to the client without making any file system calls to access the document**.

*Id.*; Appx749-750 (¶103-104); Appx 814 (¶204).

Markatos teaches that this main memory caching of web documents improves I/O performance by avoiding the overhead associated with the mass storage file system. Appx907-908 ("Main Memory Web Caching system [that]

reduces a server's load by keeping the most frequently accessed documents in the server's main memory, thus avoiding disk accesses as much as possible."); *see also* Appx749 (¶103).

Dr. Houh explained that an ordinary artisan would have been motivated to combine the teachings of Markatos and Medin such that frequently-accessed network objects are maintained on Medin's servers in main memory. Appx808 (¶¶191-192). Dr. Houh explained that Markatos and Medin are both directed to systems for storing and transmitting Internet content to users. Appx808 (¶193). Markatos thus expressly teaches improvements to the types of servers used in Medin. Appx808-809 (¶194). An ordinary artisan also would have understood that the system of Markatos would further Medin's goal of more rapidly serving web content to end users by avoiding the overhead associated with disk accesses for popular content. Appx809-810 (¶195). Additionally, Dr. Houh explained that Markatos's main memory caching techniques would allow Medin's servers to deal with the anticipated increases in Internet traffic. Appx810-811 (¶196). Dr. Houh also cited other prior art showing that it was routine to configure network caches to store popular objects in main memory. Appx811-812 (¶198) (citing, e.g., Appx1088 ("The cache will also keep exceptionally hot objects loaded in virtual memory, if this option is enabled.")).

### 3. The Board institutes review and finds all challenged claims invalid

On February 9, 2022, the Board instituted *inter partes* review after finding that Netflix demonstrated a reasonable likelihood of establishing the unpatentability of at least one claim of the ’794 patent. Appx2718, Appx2719. On February 8, 2023, the Board issued the Final Written Decision (“FWD”) determining that Netflix carried its burden of showing that claims 1, 3-9, and 11-17 of the ’794 patent are unpatentable. Appx1, Appx2. The Board thoroughly reviewed the evidence and addressed the arguments that each party advanced in the FWD. *See* Appx1-29.

#### a. The Board rejects CA’s attempt to import a volatile memory requirement into the claims

CA’s primary argument before the Board (as here) was that the challenged claims require maintaining network objects in *volatile* memory, such as RAM. Appx2780. For example, CA argued that the ’794 patent requires “a cache that includes both volatile memory (e.g., RAM) and mass storage (e.g., disk drives).” Appx2751.

The claims of the ’794 patent do not state that “cache memory” must include volatile memory. *See* Appx45 (claims 1, 17). CA thus advanced a multi-step argument to justify importing a volatile memory requirement into the claims:

- First: “the term ‘cache memory’ includes the word ‘memory’”;

- Second: an ordinary artisan would have understood that "memory" means volatile memory;
- Third: "the '794 patent uses the term 'memory' exclusively to refer to volatile memory, such as RAM";
- Fourth: every embodiment of the '794 patent includes volatile memory; and
- Fifth: as a result, the claims must be interpreted to require maintaining objects in volatile memory.

*See* Appx2780-2781.

The Board fully considered and rejected CA's interpretation of the claims. The Board first held that CA's arguments were inconsistent with the language of the claims themselves, which state that "cache memory include[es] mass storage." Appx9. The Board recognized that CA was asking the Board to re-write the claims—i.e., modifying the language "said cache memory including mass storage" to instead read "a cache that includes both volatile memory (e.g., RAM) and mass storage (e.g., disk drives)." *See id.* The Board refused to re-write the claims in this manner.

The Board also held that there is no justification in the specification that would support limiting the claims to require volatile memory. Rather, the specification makes clear that RAM is one example of "memory." Appx9; *see also* Appx31 (Abstract) ("a memory (such as RAM)"). The Board thus found that "nothing in the Specification limits 'memory'—much less 'cache memory'—to RAM or volatile memory." *Id.*

The Board also noted that the file history of the ’794 patent belies CA’s litigation-inspired interpretation of the word “memory.” Indeed, the patent applicant expressly stated during prosecution that the term “memory” is *not* limited to volatile memory:

> Applicants note that the term “memory” in the claims is meant to broadly encompass both fixed memories such as DRAMs, SRAMs, hard disks, caches, etc., as well as removable memories such as floppy disks, CD-ROMs, data tapes, etc.

Appx3012-3013.

Based on the language of the claims, the specification, and the file history, the Board held that the plain language of the claims requires the “cache memory” to include “mass storage but to permissively allow other types of memory, including volatile memory such as RAM.”[2] Appx10.

Because the Board agreed with Netflix on the construction of “cache memory,” the Board did not reach Netflix’s alternative argument—that, regardless of the construction, the proposed combinations of Medin and Seltzer (claims 1, 3-9, 11-16) and Medin and Markatos (claim 17) teach maintaining network objects in volatile memory. Appx3023-3024, Appx3029.

---

[2] The Board also stated that it had considered the extrinsic evidence and witness testimony. Appx10. That evidence also uniformly supported the Board’s holding. *See* Part V.B.6, below (addressing extrinsic evidence and witness testimony).

**b. The Board finds it would have been obvious to combine the teachings of Medin and Seltzer**

CA also argued before the Board (as it does on appeal) that an ordinary artisan would not have been motivated to combine the teachings of Medin and Seltzer. First, CA argued that Netflix could not rely on "a generic goal of improving speed and efficiency" as a basis for combining Medin and Seltzer. Appx2789-2790. Second, CA argued that an ordinary artisan would not have used Seltzer's file system techniques to cache web content in combination with Medin because another prior art reference (Markatos) teaches a different way to improve web caching using main memory. Appx2790-2793.

"After fully considering the cited supported evidence and according it appropriate weight," the Board agreed with Netflix that an ordinary artisan would have been motivated to combine Medin and Seltzer. Appx19. The Board rejected CA's assertion that the combination was based on "generic" goals. Appx20. Instead, the Board found the teachings of Medin and Seltzer are "specifically complimentary [sic]"—"Medin teaches storing copies of frequently accessed multimedia content on UNIX-based computers to cache information and read and write it to mass storage . . . and Seltzer teaches techniques to improve read and write operations on UNIX-based computers." Appx20. The Board also cited the analysis of Dr. Houh, which supports this factual finding about the interplay

between the teachings of Seltzer and Medin. Appx18 (citing paragraphs 114, 115, and 118-121 of Dr. Houh's declaration).

The Board also rejected CA's argument that the teachings of Markatos would somehow undermine the motivation to combine Medin and Seltzer. The Board found that "[e]ven if Markatos's system purportedly outperforms other systems, that does not change the fact that Seltzer suggests techniques to improve Medin's teachings." Appx.20. The Board found that an ordinary artisan would not dismiss Seltzer's teachings concerning "ways of improving the read and write operations of Medin's file system" merely because Markatos discloses other improvements to web caching. *Id.* Further, to the extent CA argued more broadly that an ordinary artisan would not use a file system to cache web content, the FWD highlighted the glaring flaw in that argument—Medin already teaches using a file system to cache web content.[3] *See id.*; *see also* Appx3026 (discussing Medin's use of a file system); Appx3138 (199:12-200:24). The '794 patent also states that file systems were commonly used for web caching prior to June 1998 (*see* Appx37

[3] Markatos does not support CA's assertion that "a file system caching technique (such as Seltzer) is inappropriate for a web caching system." Appx2793. Indeed, Markatos teaches a mass storage file system for storing web content on a web server. Appx916; *see also* Appx3027. Markatos teaches improving the operation of that web server by **also** maintaining frequently accessed objects in main memory independent from the file system. Markatos thus teaches that a mass storage file system can co-exist with independently maintaining files in main memory.

(1:35-57)) and CA's expert agreed that it was conventional to use file systems to cache web content. Appx3099 (43:10-44:19); Appx3138 (200:16-24); *see also* Appx3027.

**c. The Board finds the combination of Markatos and Medin teaches maintaining network objects in a cache memory independent of the mass storage file system**

CA did not dispute that an ordinary artisan would have combined the teachings of Medin and Markatos. Appx2794-2803. CA argued, however, that the combination does not teach "wherein said step of maintaining is performed independently of a file system for said mass storage." Appx2795-2796, 2802. CA argued that claim 17 requires maintaining every object in a cache—i.e., the entire cache—independently of a mass storage file system. CA argued that Markatos failed to teach maintaining an entire cache independently of the file system because Markatos teaches that at least 10% of the cached network objects are maintained solely in mass storage using a file system.

Netflix responded that claim 17 does not require maintaining the entire cache independently of a mass storage file system. Appx3030. Rather, claim 17 is a method claim that recites "receiving **a set of network objects**" and "maintaining **said network objects** in a cache memory" wherein "said step of maintaining is performed independently of a file system for said mass storage." Appx45 (claim 17). Netflix explained that the claim thus encompasses, for example, maintaining a

set of network objects in main memory independently of the mass storage file system, while simultaneously maintaining other sets of objects in mass storage using the file system. *See* Appx40 (8:9-13), Appx38 (4:9-14), Appx41 (10:22-29), Appx718-720 (¶¶43-44).

The Board fully considered the arguments and evidence presented by both sides and concluded that the combination of Medin and Markatos teaches the limitation of claim 17, including the "wherein" clause. The Board rejected CA's assertion that the claims require maintaining every network object in the cache memory independently of the mass storage file system. The Board explained that the method of claim 17, on its face, applies to "a set of network objects," not all cached objects. Appx26-27. As such, "[t]he claim does not exclude maintaining other network objects—network objects other than 'said set of network objects'—in the mass storage and having the maintenance of those other network objects implicate a file system." Appx27. The Board held that the combination of Medin and Markatos would thus render claim 17 obvious because the combination would result in "'keeping the most frequently accessed documents in the server's main memory'" independently of Medin's mass storage file system. *Id.*

## IV. SUMMARY OF THE ARGUMENT

Each argument that CA raises on appeal lacks merit. The FWD should be affirmed.

1. The Board correctly held that "cache memory" does not require volatile memory. Nothing in the specification of the '794 patent limits "cache memory" to volatile memory. To the contrary, the claims expressly state that "cache memory" includes mass storage, which is a form of nonvolatile memory. CA argues that the word "memory," standing alone, refers "exclusively" to volatile memory. But the claim term at issue is "cache memory," not "memory." Moreover, CA's assertions concerning the meaning of "memory" lack support. The '794 patent does not define "memory" to mean exclusively volatile memory nor disavow the ordinary scope of the term "memory." During prosecution, the patentees stated the opposite—that "memory" refers to many different types of memory (including mass storage). CA's expert also admitted that the accustomed meaning of "memory" was not limited to volatile memory. Numerous dictionary definitions similarly state that "memory" refers to the place where data is stored and is not limited to volatile memory.

2. Even if "cache memory" required volatile memory (it does not), the FWD should be affirmed because the prior art combinations teach maintaining objects in volatile memory. In particular, the combination of Medin and Seltzer teaches

maintaining objects in buffer memory, which is volatile memory. The combination of Medin and Markatos teaches maintaining objects in main memory, which is also volatile memory.

3. Substantial evidence supports the Board's determination that an ordinary artisan would have been motivated to combine Medin and Seltzer. Medin teaches caching network objects using UNIX-based computers. Seltzer teaches techniques to improve the performance of UNIX-based computers in storing data. Netflix submitted extensive expert testimony explaining why the teachings of Medin and Seltzer are specifically complementary. CA does not identify a lack of substantial evidence supporting the Board's finding. Instead, CA asks the Court to "balance" the evidence de novo and reach a different conclusion. CA's argument disregards the standard of review.

4. The Board correctly held that the combination of Medin and Markatos teaches maintaining network objects independently from a mass storage file system. Markatos expressly teaches storing frequently accessed network objects in main memory to avoid the overhead associated with a file system. CA argues that the teachings of Markatos are insufficient because Markatos only stores up to 90% of network objects independently of the mass storage file system. CA contends that claim 17 requires maintaining "all" network objects independently of a mass storage file system. CA's argument ignores the plain language of claim 17, which

recites receiving "a set of network objects" in response to a user request and maintaining **that set** of network objects independently of the mass storage file system. Conversely, claim 17 does not require maintaining "all" network objects independently of the mass storage file system.

# V. ARGUMENT

## A. Standard of Review

The Court reviews the Board's claim construction de novo. *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 808 (Fed. Cir. 2021). To the extent the Board made factual findings based upon the intrinsic record, those factual findings are reviewed by this Court without deference. *Id.* But this Court reviews "any underlying fact findings about extrinsic evidence . . . for substantial-evidence support when the appeal comes from the Board." *Id.*

The Court reviews the Board's obviousness determinations de novo, and subsidiary findings of fact for substantial evidence. *In re Stepan*, 868 F.3d 1342, 1345 (Fed. Cir. 2017). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *IXI IP, LLC v. Samsung Elecs. Co.*, 903 F.3d 1257, 1262 (Fed. Cir. 2018). "Where two different conclusions may be warranted based on the evidence of record, the Board's decision to favor one conclusion over the other is the type of decision that must be

sustained by this court as supported by substantial evidence." *Id.* (citing *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 970 (Fed. Cir. 2007)).

### B. The Board correctly construed "cache memory"

CA's primary argument on appeal is that the Board erred in construing "cache memory." CA Br. 27-39. In particular, CA challenges the Board's holding that "cache memory" requires mass storage, but may permissively include other types of memory. *Id.*; *see also* Appx10. According to CA, "cache memory" must be construed to also require **volatile** memory, such as random access memory (RAM). *See id*.

As set forth below, CA's position is inconsistent with the language of the claims, the specification of the '794 patent, the prosecution history, the testimony of both parties' experts, and numerous technical dictionary definitions. Conversely, the intrinsic and extrinsic evidence uniformly supports the Board's construction of "cache memory."

#### 1. The Board did not eliminate "memory" from the claims

As a threshold matter, the Court should reject CA's effort to re-characterize the Board's construction of "cache memory." CA repeatedly advances the mantra that the Board held "cache memory" does not "require memory at all." CA Br. 27, 34; *see also id.* at 35 (the Board "reads out 'memory' from the Challenged Claims"). The Board made no such holding. The Board found that "cache

memory" does not require **volatile** memory, which is one specific type of memory. *See* Appx10. At the same time, the Board held that the claims require "cache memory" to include mass storage, which is another type of memory (nonvolatile memory). Appx10; *see also* Appx3108 (78:8-14, 80:13-19) (acknowledging mass storage is nonvolatile memory). The Board also held that "cache memory" may permissively include other types of memory. Appx10. As such, it is simply incorrect to assert the Board's construction "reads out 'memory' from the Challenged Claims." *See* CA Br. 35. The Board simply held that "cache memory" does not specifically require (but may still include) **volatile** memory.

### 2. The claims support the Board's construction

"Claim construction begins with the language of the claims themselves." *Imaginal Systematic, LLC v. Leggett & Platt, Inc.*, 805 F.3d 1102, 1108 (Fed. Cir. 2015). CA accuses the Board of "ignoring" the language of the claims. CA Br. 29, 34. But the Board's holding—that "cache memory" must include mass storage but may also include other types of memory (*see* Appx10)—is based **directly** on the language of the claims. Indeed, every challenged claim recites:

> **maintaining said network objects in a cache memory** in a cache engine, said cache engine connected via a network to the server and the client, **said cache memory including mass storage**;

*See, e.g.*, Appx45 (claims 1, 17); *see also* Appx9-10 (interpreting "cache memory" based on language of claims).

CA dedicates only **one sentence** of its appeal brief to analyzing the language of the claims. *See* CA Br. 30. CA observes that "the claim language itself . . . includes the words 'memory' and 'mass storage.'" *Id*. CA argues that the word "memory" is distinct from "mass storage" and refers "exclusively" to volatile memory. *Id*. But the claim language directly refutes this argument. As noted above, the claims require "said cache memory **including** mass storage." As such, the claims do not draw a "distinction" between "memory" and "mass storage," nor use "memory" to refer "exclusively" to volatile memory. *Id.*, 27, 30. The exact opposite is true—the claims make clear that mass storage (i.e., nonvolatile memory) is a form of "cache memory." *See id.*, 27, 30.

CA's claim construction argument also fails because it requires altering the language of the claims. Rather than defining "cache memory," CA proposes rearranging and supplementing the claim language to require "a cache" that includes "both" mass storage and **volatile** memory. CA Br. 30. But this Court "has consistently adhered to the proposition that courts cannot alter what the patentee has chosen to claim as his invention." *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1362 (Fed. Cir. 2000). Indeed, "interpreting what is meant by a word in a claim is not to be confused with adding an extraneous limitation." *Kemco*, 208 F.3d at 1362. Here, the patentees chose to claim "said cache memory including mass storage," not "a cache that includes both mass storage and volatile

memory." CA's proposed "construction" should be rejected as an effort to rewrite the claims to insert an additional volatile memory limitation.

### 3. The written description supports the Board's construction

The written description also supports the Board's construction because it includes embodiments where network objects are stored in mass storage and, optionally, in other types of memory.

It is axiomatic that "claims must be read in view of the specification, of which they are part." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). While the specification is properly used to interpret the meaning of a claim, it is "improper to read limitations from the written description into a claim." *Bradium Techs. LLC v. Iancu,* 923 F.3d 1032, 1049 (Fed. Cir. 2019). "For instance, although the specification often describes very specific embodiments of the invention, [the Court has] repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323; *see also id.* ("[P]ersons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments"). As such, it is important to distinguish between a patentee who "is setting out specific examples of the invention" to teach an ordinary artisan to make and use the invention versus a patentee who "intends for the claims and the embodiments in the specification to be strictly coextensive." *Id.*

Here, the term "cache memory" is not used in the specification outside of the claims. *See* Appx8. But the specification does provide various examples of places where the cache engine maintains network objects. In some embodiments, the cache engine is depicted as maintaining network objects only in a mass storage. For example, figure 1 depicts maintaining network objects (114) in mass storage (104):




FIG. 1

Appx33 (FIG. 1, excerpted).

In other embodiments, the cache engine maintains network objects in a combination of mass storage and volatile memory. For example:

> In a preferred embodiment, the cache engine 100 uses the memory 103 as a cache for those network objects 114 maintained using mass storage 104, while using the combined memory 103 and mass storage 104 as the cache 102 for those network objects 114 available on the network.

Appx38 (4:9-14); *see also* Appx40 (8:9-15).

The examples provided in the specification thus support construing "cache memory including mass storage" to require mass storage and permissively allow other types of memory (e.g., volatile memory). Conversely, the examples provided in the specification do not reflect any intent to define "cache memory" to always require volatile memory. Indeed, construing "cache memory" to require volatile memory would improperly exclude embodiments (e.g., figure 1), where network objects are maintained in mass storage but not volatile memory. *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) ("[W]here claims can reasonably to interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary."); *Lexington Luminance LLC v. Amazon.com Inc.*, 601 Fed. Appx. 963, 971 (Fed. Cir. 2015) ("constructions that exclude disclosed embodiments without a clear justification are disfavored") (citing *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1324 (Fed. Cir. 2011)).

### 4. The specification does not support construing "cache memory" to require volatile memory

CA argues that the specification provides "dispositive" evidence that "cache memory" must be construed to require volatile memory. CA Br. 30-35. CA offers two rationales to support this assertion. First, CA argues that "cache memory" requires "volatile memory" because the patentees used the word "memory" to mean "exclusively" volatile memory. *See, e.g., id*. at 30 ("[T]he '794 Patent uses the term, 'memory,' exclusively to refer to volatile memory[.]"). Second, CA argues "cache memory" must include both mass storage and volatile memory because every embodiment includes both elements. *See, e.g., id.* ("[E]very time the '794 Patent refers to cache 102, it refers to the cache including both memory 103 and mass storage 104."); *id*. at 31-33 (discussing embodiments). Both arguments lack merit.

#### a. Examples of "memory" from the specification do not define or limit "cache memory"

As a threshold matter, CA's reliance on examples of "memory" from the specification is inapposite because the claim term at issue is "cache memory," not "memory." There is no indication in the written description or claims that "memory" is a synonym for "cache memory." Rather, CA argues that "cache 102" (not "memory 103") is the equivalent of "cache memory." CA Br. 30-33. As such, even if the specification used "memory," standing alone, to refer "exclusively" to

volatile memory, that would not justify construing "cache memory" to require volatile memory. *See Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, fn. 8 (Fed. Cir. 2005) ("Network Commerce admits that 'download component' appears nowhere in the specification, but argues that since the word component is used broadly in the specification to refer to all sorts of things, 'download component' should be construed just as broadly. This argument is unavailing. The specification's broad usage of one word from the claim term 'download component' does not suggest that the phrase 'download component' has the same meaning as that one word."); *IGT v. Bally Gaming International, Inc.*, 659 F.3d 1109, 1117 (Fed. Cir. 2011) ("Extracting a single word from a claim divorced from the surrounding limitations can lead construction astray.").

#### b. The specification does not redefine or disavow the ordinary scope of "memory"

Even if the disputed term were "memory" (rather than "cache memory"), the specification does not redefine "memory" to mean "exclusively" volatile memory.

It is undisputed that "memory" was a commonly used term in the art at the time of the application for the '794 patent. *See* Appx3179-3181 (¶¶12-13) (walking through use of "memory" prior to June 1998). CA's expert confirmed that the accustomed meaning of "memory" to an ordinary artisan was the place "where you can store and retrieve data." Appx3102 (56:2-23) ("[T]he general definition of the term 'memory' is where you can store and retrieve data," which includes, for

example, "the magnetic disk."). CA's expert also acknowledged many well-known types of "memory" other than volatile memory, including nonvolatile memory (e.g., mass storage), fixed memory, flash memory, and disk memory. Appx3100 (48:22-49:7), Appx3108 (80:13-25, 82:9-83:7).

Despite the accustomed meaning of "memory," CA argues that the patentee intended to restrict "memory" to mean only one type of memory (volatile memory) in the '794 patent. CA Br. 30 ("[T]he '794 Patent uses the term, 'memory,' exclusively to refer to volatile memory."). As support, CA cites a series of statements from the '794 patent that refer to maintaining network objects in "memory (such as RAM)" or "memory 103." *See id*. CA argues that each of these examples of "memory" is "volatile memory." *Id*. CA concludes, based on the consistent use of "memory" to refer to volatile memory, "a POSITA could conclude only that the '794 Patent uses the term, 'cache memory,' to refer to a cache with volatile memory." *Id*. CA's arguments do not satisfy the burden required to redefine "memory" to mean only volatile memory.

As this Court has explained, "[t]here is a 'heavy presumption' that claim terms 'carry their accustomed meaning in the relevant community at the relevant time.'" *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014). "Departure from the ordinary and customary meaning is permissible only when the patentee has acted as his own lexicographer or disavowed claim scope in the

specification or during the prosecution history." *Id*. at 1348. "To act as a lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' and 'clearly express an intent to redefine the term.'" *Luminara Worldwide, LLC v. Liown Electronics Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016).

CA cannot satisfy the "heavy presumption" required to redefine "memory" to mean only volatile memory. The '794 patent does not clearly set forth a definition of "memory," nor, as the Board noted, include any clear expression of intent to restrict "memory" to only volatile memory. Appx9. While the '794 patent refers to volatile memory (RAM) as **an example** of "memory" ("memory (such as RAM)"), Appx31 (Abstract), such examples are not sufficient to redefine "memory" to mean only volatile memory. *See Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 44 (Fed. Cir. 2020) (giving an example of a disputed claim term "does not meet the exacting standard for redefining" the term). Similarly, the consistent use of "memory" to refer to volatile memory is also insufficient. As this Court has held, "disclosing embodiments that all use the same term the same way is not sufficient to redefine a claim term." *Thorner v. Sony Computer Entertainment LLC*, 669 F.3d 1362 (Fed. Cir. 2012). Further, referring to maintaining objects in both "memory" and "mass storage" does not alter the accustomed meaning of "memory" to exclude mass storage. *Id*. at 1368 ("Simply referring to two terms as alternatives . . . is not sufficient to redefine a claim term."); *see also Smith &*

*Nephew, Inc. v. Hologic, Inc.*, 721 Fed. Appx. 943, 946 (Fed. Cir. 2018) (the fact that the claim recites "simultaneously rotate, translate, and reciprocate" does not change the ordinary meaning of "translation" and "reciprocation" and render them mutually exclusive).

#### c. CA cannot read limitations into the claims from exemplary embodiments

CA also argues that "cache memory" must be construed to require both mass storage and volatile memory because "every time" the specification refers to "cache 102," the cache includes both mass storage and volatile memory. CA Br. 30-33.

The factual predicate for CA's argument is, at best, incomplete. While "memory 103" is present in the embodiments that CA cites, "memory 103" is not used to maintain network objects in each of those embodiments. *See, e.g.*, Appx33 (FIG. 1) (maintaining network objects 114 in mass storage); Appx38 (4:9-14) (stating that maintaining network objects in memory is a feature of "a preferred embodiment"). As such, "memory 103" does not function as a "cache memory" in each of the exemplary embodiments. *See* Part V.B.3, *supra*.

Moreover, CA's argument violates a fundamental principle of claim construction—that "it is improper to read limitations from the written description into a claim." *Bradium Techs. LLC v. Iancu,* 923 F.3d 1032, 1049 (Fed. Cir. 2019). CA argues, quite expressly, that the claims should be construed to require both

volatile memory and mass storage because embodiments include those features. CA Br. 30-33. But this Court has repeatedly rejected that very argument. *See, e.g.*, *Liebel-Flarsheim Company v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification — even if it is the only embodiment — into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."); *Thorner*, 669 F.3d at 1365 ("It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term."); *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (it is "not enough that the only embodiments, or all of the embodiments, contain a particular limitation to limit a claim term beyond its ordinary meaning.").

CA does not identify any "clear indication" that the patentees intended the claims to be co-extensive with the exemplary embodiments. *Phillips*, 415 F.3d at 1323. Nor does CA identify any basis to believe that the patentees would have wanted to limit the definition of "cache memory" to the "exact representations depicted in the embodiments." *See id*. Rather, this case is a prototypical example of a party attempting to use claim construction as a trojan horse to inject limitations into the claims from the written description.

### 5. Prosecution history confirms that the ’794 patent uses “memory” according to its ordinary memory

The prosecution history also refutes CA’s argument that the patentees intended to use the word “memory” to refer “exclusively” to volatile memory. Appx3012-3013. Indeed, the inventors confirmed the opposite:

> Applicants note that the term “memory” in the claims is meant to broadly encompass both fixed memories such as DRAMs, SRAMs, hard disks, caches, etc., as well as removable memories such as floppy disks, CD-ROMs, data tapes, etc.

Appx3012-3013.

CA argues that the Board “mischaracterized” the above statement. According to CA, the patentees’ comment on the meaning of “memory” was limited to only the meaning of “memory” when used in *Beauregard*-style claims, not the meaning of “memory” in other claims. CA Br. 35-36. But CA misses the point. The prosecution history confirms that the inventors understood the ordinary meaning of “memory” when they submitted the application for the ’794 patent—i.e., that “memory” is not limited to volatile memory. Despite that accustomed meaning, the patentees did not re-define “memory” in the specification. To the contrary, they drafted the claims to state that “cache memory” includes mass storage, which is consistent with the ordinary meaning of “memory” (and the statements in the file history) and inconsistent with CA’s litigation-inspired position that “memory” refers “exclusively” to volatile memory. As the Board

held, the "statement from the prosecution history evidences that the applicant understood 'memory' to be a broad term and that the applicant could have limited its claims to particular types of memory, but chose not to." Appx9.

### 6. Extrinsic evidence refutes CA's assertions concerning the ordinary meaning of "memory"

The extrinsic evidence is also consistent with the Board's determination that "cache memory" includes mass storage and may also, optionally, include other types of memory. Conversely, the extrinsic evidence refutes CA's arguments that the term "'memory' referred nearly exclusively to RAM" and is distinct from mass storage. CA Br. 37.

The parties submitted multiple dictionary definitions to the Board. Each confirms that "memory" is broader than volatile memory. Indeed, the very definition that CA cites in its brief states that "memory" is "[a] device where information can be stored and retrieved," including disk drives (which are not volatile memory). CA Br. 37-38 (quoting Appx2998). That definition goes on to provide multiple examples of memory, only one of which is volatile memory.[4]

---

[4] Other than RAM, all types of memory referenced in the definition are nonvolatile memory: EEPROM (electronically erasable programmable read-only memory), EPROM (erasable programmable read-only memory), flash memory, PROM (programmable read-only memory), and ROM (read-only memory). Appx3179 (noting that these types of memory "would not be appropriate for use as main memory"); Appx2998 ("nonvolatile memory … such as ROM, EPROM, EEPROM, or PROM").

Multiple other definitions confirm the ordinary meaning of "memory" is not limited to volatile memory. *See* Appx3037 ("**memory** (n.) The place where data is recorded and stored, either permanently or temporarily."); Appx3040 ("**memory** A device or medium that can retain information for subsequent retrieval."); Appx3044 ("**memory** [COMPUT SCI] Any apparatus in which data may be stored and from which the same data may be retrieved.").

Notably, the above dictionary definitions are consistent with patentees' statement during prosecution that "memory" broadly means where data is stored. *Compare* Appx3012-3013 *with* Appx3037, Appx3040, Appx3044, and Appx3047. Moreover, CA's expert confirmed that these definitions reflect the ordinary meaning of "memory" at the time that the application for the '794 patent was filed:

> Q. Is the definition of "memory" provided here in 1047 [Appx3037] consistent with the accustomed meaning of that term to a POSITA in June of '98?
>
> A. So, like I said, even in my declaration, **the general definition of the term "memory" is where you can store and retrieve data**, so this includes the main [memory]. And here it says it also include the magnetic disk.

Appx3102 (56:2-23).

CA's expert also admitted that the term "memory" is used to describe many different types of memory, including mass storage. For example, Dr. Sundaresan testified that "nonvolatile memory" includes "solid state drives" and "hard drives." Appx3108 (80:13-25). He testified that he was familiar with "flash memory," and

"fixed memory." Appx3108 (80:13-25), Appx3109 (82:12-83:7). He also testified that "disk memories are very common" and refer to "magnetic disks, optical disks." Appx3109 (82:12-83:7). Netflix's expert consistently opined that "a POSITA would also have commonly referred to external storage such as disk drives or tape drives as 'memory.'" Appx3179 (¶12) (citing supporting evidence). As such, the extrinsic evidence uniformly supports the Board's holding that "cache memory" does not require volatile memory.

#### 7. Netflix did not define "cache memory" to require volatile memory

Finally, CA argues that "cache memory" must be construed to require volatile memory because Netflix implicitly construed "cache memory" to require both volatile memory and mass storage in the petition for *inter partes* review. CA Br. 33-34. But Netflix's petition directly refutes this assertion. Netflix expressly argued that Medin teaches "cache memory" because Medin teaches maintaining network objects in mass storage. Appx85; *see also* Appx86 ("Medin teaches maintaining the network objects in a cache memory of a cache engine because Medin teaches that the network objects are stored on a disk array of the regional servers and on a cache storage device of the local servers.").

CA selectively quotes a passage from the petition where Netflix argued that the prior art "also" teaches "cache memory" because Medin's servers also include volatile memory. *See* CA Br. 33 (citing Appx88). Netflix went on to explain that

the combinations of Medin and Seltzer and Medin and Markatos would also use volatile memory to maintain network objects. Appx92-93 (Seltzer's recording and retrieving objects from staging buffers); Appx112-113 (Markatos's main memory caching). Netflix's arguments were entirely consistent with construing "cache memory" to require mass storage but to also optionally allow use of other types of memory. Conversely, as the Board held, Netflix never argued or implied that "cache memory" required volatile memory.[5] Appx10.

### C. Substantial Evidence Supports the Final Written Decision under Any Construction of "Cache Memory"

Even if "cache memory" requires volatile memory (it does not), substantial evidence would still support the Board's decision that the challenged claims of the '794 patent are invalid because the cited prior art combinations—Medin/Seltzer and Medin/Markatos—both teach maintaining network objects in volatile memory.

#### 1. The Court may consider the alternative ground for affirming the Board's decision

Having found that "cache memory" does not require volatile memory, the Board did not reach the issue of whether the combinations of Medin and Seltzer and Medin and Markatos would nonetheless teach that requirement. *See* Appx7-10,

---

[5] CA accuses the Board of "completely disregard[ing]" Netflix's "original reading" of "cache memory." CA Br. 34. In reality, the Board acknowledged but disagreed with CA's argument. *See* Appx10 (n.5) ("We also disagree with Patent Owner's arguments that the Petition implicitly construes 'cache memory' to include RAM and mass storage.").

Appx15-16. The Board, however, recognized that Netflix argued that each combination involved maintaining objects in volatile memory. *See* Appx17 ("Petitioner also cites Seltzer's teachings of using 'staging buffers' in which data is first written to buffer memory and read from buffer memory as part of the process of storing a file on disk."); Appx27 ("We note Petitioner contends Medin teaches using a volatile memory as part of its system."); *see also* Appx3023-3024 ("The combination of Medin and Seltzer also teaches maintaining network objects in volatile memory."); Appx3029 ("The combination of Medin and Markatos teaches maintaining network objects in volatile memory[.]").

It is well-established that "a party may raise on appeal any issue that was raised or actually decided below." *Lifestyle Enter., Inc. v. United States*, 751 F.3d 1371, 1377 (Fed. Cir. 2014) (collecting cases). Further, the Court "may affirm a judgment of a district court on any ground the law and the record will support so long as that ground would not expand the relief granted." *Propellex Corp. v. Brownlee*, 342 F.3d 1335, 1343 n.5 (Fed. Cir. 2003). This rule—allowing affirmance on alternative grounds—has particular application in the context of challenged claim constructions. When the Court determines that a trial judge has incorrectly construed a claim term, the Court first "independently construe[s] the claim to determine its correct meaning, and then determine[s] if the facts presented at trial can support the appealed judgment" under the proper construction. *Teleflex,*

*Inc. v. Facias North America Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002); *see also Hyperphrase v. Google*, 260 F. Appx. 274, 280-281 (Fed. Cir. 2008) (holding that the court may "adopt an alternative ground for affirmance" where the trial court erroneously construed a claim term).

As such, even if the Court holds that "cache memory" requires volatile memory, the Court should still affirm the Board's judgment that the challenged claims are invalid because the record below includes substantial evidence that both prior art combinations teach maintaining objects in volatile memory.

#### 2. The combination of Medin and Seltzer teaches maintaining sets of network objects in both mass storage and buffer memory

It is undisputed that Medin teaches maintaining network objects in mass storage. Appx3022, Appx2771, Appx2775, Appx2790. Medin also teaches caching servers that include volatile memory. Appx3023; *see also* Appx868 (7:46-50; 7:61-8:2, 8:63-67), Appx869 (9:8-9, 9:20-26, 9:12-31). But Medin does not expressly state whether network objects are maintained in the volatile memory.

In challenging claims 1, 3-9, and 11-16, Netflix submitted evidence that it would have been obvious to combine the caching system of Medin with the memory management techniques of Seltzer. *See* Part V.D (addressing substantial evidence supporting the combination of Medin and Seltzer). Netflix cited, *inter alia*, Seltzer's teachings that recording objects in memory buffers (volatile

memory) before writing those objects to mass storage improves system performance:

> Seltzer's recording and retrieval techniques—e.g., collecting objects in a staging buffer, writing objects sequentially to disk, extent-based reading of multiple objects in single operation (*see, e.g.,* Ex. 1005 (Seltzer), pp. 307, 319, 324)—result in dramatic performance improvements (*id.*, p. 324, *see also id.*, p. 307).

Appx78; *see also* Appx92 ("Seltzer also teaches recording and retrieving objects because Seltzer teaches using 'staging buffers,' whereby data is first written (recorded) to buffer memory and read (retrieved) from buffer memory as part of the process for storing (maintaining) a file on disk."); Appx96 ("A POSITA would have understood that using a memory buffer as a staging area for disk writes minimizes retrieval times from mass storage because the buffering process allows the objects to be collected and organized so that they can be written in an optimal (e.g., sequential, contiguous) manner to disk for later retrieval.").

CA never disputed that the combination of Medin and Seltzer teaches maintaining objects in a memory buffer. Quite the contrary, CA acknowledged that such use of a memory buffer was conventional. Appx2787-2788 (stating that "virtually every file system uses a write buffer to temporarily cache in memory files being written to disk"). As such, even if "cache memory" requires "both" mass storage and volatile memory, substantial evidence still supports the Board's finding that claims 1, 3-9, 11-16 are invalid because the combination of Medin and

Seltzer teaches maintaining network objects in a memory buffer (volatile memory) before writing those objects sequentially to mass storage.

**3. The combination of Medin and Markatos teaches maintaining sets of network objects in both volatile memory and mass storage.**

For challenged claim 17, the combination of Medin and Markatos also teaches maintaining network objects in "both" mass storage and volatile memory. Appx107-113. Indeed, the entire premise of the combination of Medin and Markatos is that it would have been obvious to modify Medin's caching servers based on the teachings of Markatos to maintain frequently-accessed objects in main memory (volatile memory) independent of the mass storage file system:

> Markatos is directed to improving web servers by avoiding the overhead associated with disk accesses and traditional file system calls. Ex. 1006 (Markatos), pp.893-894; Ex. 1003 ¶190. Rather than maintaining all content on disk, Markatos teaches "keeping the most frequently accessed documents in the server's main memory, thus avoiding disk accesses as much as possible." Ex. 1006 (Markatos), p. 894; Ex. 1003 ¶203.

Appx112; *see also* Appx108 ("A POSITA would have been motivated to combine the main memory caching technique of Markatos with the cache servers of Medin[.]"); Appx110 ("[A] POSITA would have been motivated to combine Markatos and Medin and expected success in doing so because caching web documents in main memory (as in Markatos) was a routine feature of network caching systems, such as the system of Medin."); Appx908 ("When a client

requests a document that resides in the server's main memory cache, the document is directly read from the server's cache and sent to the client without making any file system calls to access the document.").

CA does not dispute that Markatos teaches maintaining network objects in volatile memory. *See, e.g.*, CA Br. 58-59 ("Markatos's proposed system can avoid use of a file system only to the extent the system can find the requested documents in main memory (i.e., RAM)."). As such, even if "cache memory" requires "both" mass storage and volatile memory, substantial evidence still supports the Board's finding that claim 17 is invalid because the combination of Medin and Markatos teaches maintaining network objects in both main memory (volatile memory) and mass storage.

### D. The Board Correctly Found a Motivation to Combine Medin and Seltzer

The Board held that the combination of Medin and Seltzer renders claims 1, 3-9, and 11-16 obvious. *See* Appx12-24. CA argues that the Board erred in finding that an ordinary artisan would have been motivated to combine the teachings of Medin and Seltzer. *See* CA Br. 51-56. CA's argument fails for at least two related reasons: (i) CA applies the wrong standard of review; and (ii) substantial evidence supports combining the teachings of Medin and Seltzer.

**1. CA applies the wrong standard of review**

"The Board's motivation to combine finding is reviewed for substantial evidence." *Outdry Techs. Corp. v. Geox S.p.A.*, 859 F.3d 1364, 1368 (Fed. Cir. 2017); *see also Par Pharmaceutical, Inc. v. TWi Pharmaceuticals, Inc.*, 773 F.3d 1186, 1196 (Fed. Cir. 2014) ("The presence or absence of a reasonable expectation of success is also a question of fact."). "A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding." *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1380 (Fed. Cir. 2016).

CA does not (and cannot) show that the Board lacked substantial evidence to support its finding of a motivation to combine. As discussed below, the Board's decision finds evidentiary support in (i) the "specifically compl[e]mentary" teachings of Medin and Seltzer; (ii) the testimony of Dr. Houh, who explained why an ordinary artisan would have combined Medin and Seltzer; and (iii) contemporaneous statements in another prior art reference (Ghandeharizadeh) stating that the type of techniques taught in Seltzer are particularly useful for caching web content.

Rather than arguing that the Board's decision lacks substantial evidence, CA argues that it submitted "substantial" competing evidence showing there was no motivation to combine. CA Br. 52 (referring to "substantial evidence showing

that there is no reason to combine Medin and Seltzer”). CA then rehashes (often *verbatim*) the same arguments it presented to the Board. *Compare* CA Br. 51-56 *with* Appx2789-2793. CA acknowledges that the Board considered these arguments. *See* CA Br. 51-56; *see also* Appx16-21. CA also admits that the Board credited the testimony of Netflix’s expert in rejecting CA’s arguments. CA Br. 55 (admitting the Board “relied heavily on Netflix’s expert testimony”). But CA nonetheless argues that the Board’s decision should be reversed because the “balance of the record evidence” indicates that an ordinary artisan would not have combined the teachings of Medin and Seltzer. CA Br. 55-56.

CA’s argument misapprehends the governing standard of review. The issue on appeal is not whether there is evidence—even “substantial” evidence—that supported CA’s position below. The issue is whether the Board’s finding lacks substantial evidence. CA cannot meet that standard.

#### 2. Substantial evidence supports the Board’s finding of a motivation to combine

This is not a case where the Board issued a conclusory, unexplained, or unsupported finding of a motivation to combine. Nor did the Board disregard any evidence or arguments. Rather, the Board carefully analyzed the evidence and arguments the parties submitted and explained why that evidence supports the conclusion that an ordinary artisan would have combined the teachings of Medin and Seltzer.

**a. The teachings of Medin and Seltzer are "specifically complimentary"**

The Board found that an ordinary artisan would have been motivated to combine Medin and Seltzer to advance the shared goal of "improving the speed and efficiency of systems for storing information." Appx19-20. The Board acknowledged CA's argument—repeated now on appeal—that improving speed and efficiency is "too generic" to provide a motivation to combine. *See* Appx20; *compare id. with* CA Br. 53. But the Board disagreed, finding that the record evidence shows Medin and Seltzer are "specifically compl[e]mentary." Appx20. In particular, the Board found that Medin teaches caching objects in mass storage using UNIX-based computers and Seltzer teaches specific techniques to improve the manner in which UNIX-based computers record and retrieve data from mass storage. *Id*. ("Medin teaches storing copies of frequently accessed multimedia content on UNIX-based computers to cache information and read and write it to mass storage . . . and Seltzer teaches techniques to improve read and write operations on UNIX-based computers.") (citations omitted); *see also id.* ("Petitioner's proposed combination includes Medin's teachings of a file system to cache network objects and Seltzer's teachings of ways of improving the read and write operations of a file system.").

Substantial evidence supports the Board's findings. Medin teaches a system designed to more quickly and efficiently store and retrieve data for users by

caching the data on local servers. *See, e.g.*, Appx870 (11:40-45, 11:55-60). Medin teaches the servers may use a UNIX operating system (Appx868 (7:61-63), Appx869 (9:12-14) and store the data on disk (*see, e.g.*, Appx870 (11:46-50)). Medin does not provide specifics on how the UNIX-based servers record data to disk, but the parties agreed that the servers would use a file system for that purpose. Appx3025 (citing Appx77-78, Appx2771, Appx2775, Appx2790). Seltzer, in turn, teaches techniques to improve the performance of UNIX file systems. *See* Appx881 ("An Implementation of a Log-Structured File System for UNIX."). The "fundamental idea" of Seltzer is "to improve file system performance by storing all file system data in a single, contiguous log." *Id*. Performance of the UNIX-based computers is optimized because "the files are placed contiguously on disk" and, as such, "no seek is required between writes" and the contiguous data can be read "over a brief period of time." *Id*.; *see also* Appx882 ("New blocks are allocated to optimize for sequential file access. Ideally, logically sequential blocks of a file are allocated so that no seek is required between two consecutive accesses."). Seltzer teaches this system has the "potential for dramatically improving system throughput." Appx881.

In addition to the express teachings that the system of Seltzer improves the file system performance of UNIX-based computers like those disclosed in Medin, Netflix's expert—Dr. Houh—provided a lengthy analysis and supporting

evidentiary citations explaining why an ordinary artisan would have been motivated to combine the teachings of Medin and Seltzer. *See* Appx754-760 (¶¶113-121); Appx3182-3186 (¶¶15-19). Dr. Houh explained that Seltzer's memory management techniques would have improved the response times of Medin's servers, which is a "fundamental objective" of network caching. Appx756-757 (¶116). Dr. Houh also explained that Seltzer's memory management techniques would have supported the high transaction rates experienced by Internet caching servers. Appx759 (¶120).

As reflected above, the motivation to combine Medin and Seltzer is far from "generic." More importantly, the Board's finding is supported by substantial evidence—the specific and express teachings of Medin and Seltzer, extensive expert analysis, and citations to other supporting evidence.

**b. Seltzer's techniques are well-suited for web caching**

CA also repeats its argument that an ordinary artisan would not have combined Medin and Seltzer because Seltzer's "file system caching technique . . . is inappropriate for a web caching system." *Compare* CA Br. 53-56 *with* Appx2790-2793. As support, CA cites statements from Markatos that explain how Markatos' main memory web caching differs from using a file system to cache documents. CA Br. 54. Again, the Board expressly considered and rejected this argument, explaining:

> Petitioner's proposed combination includes Medin's teachings of a file system to cache network objects and Seltzer's teachings of ways of improving the read and write operations of a file system. Even if Markatos's system purportedly outperforms other systems, that does not change the fact that Seltzer suggests techniques to improve Medin's teachings that a POSITA would have had reason to implement to substantially minimize the time for retrieving network objects from mass storage with a reasonable expectation of success.

Appx20.

As reflected in the Board's decision, the fundamental flaw in CA's argument is that Medin **already teaches** using a file system to cache network objects. Appx3138 (199:12-200:24). Moreover, the '794 patent recognizes that file systems were conventionally used to cache network objects. Appx37 (1:35-57). Even Markatos teaches using a file system to store network objects (while also simultaneously maintaining other objects in main memory independently of the file system). As such, CA's argument that file systems are "inappropriate for web caching" is contrary to the evidence of record.

Substantial evidence also supports the finding that Seltzer's specific techniques would be used for caching web content in connection with the system of Medin. As CA acknowledges (CA Br. 55), the Board credited the opinions of Dr. Houh, who testified that "Seltzer's techniques were particularly well-suited for UNIX servers that cache web content." Appx3182-3183 (¶16). Contrary to CA's assertions, Dr. Houh's testimony was not merely "a restatement of Netflix's own

argument." *See* CA Br. 55. Rather, Dr. Houh explained, from a technical perspective, the reasons why "Seltzer's techniques were favorable for web content." Appx3182-3183 (¶16). In particular, Seltzer's techniques: (i) allow high transaction rates; (ii) provide efficient storage of files for quick retrieval; and (iii) allow related web content (e.g., embedded images, JavaScript, style sheet files) to be stored close together. *Id*. Dr. Houh also cited the contemporaneous teachings of another prior art reference (Ghandeharizadeh) stating that storing content contiguously on disk (as taught in Seltzer) is particularly useful for web content:

> Such a file system is particularly useful for repositories whose primary functionality is to disseminate information, such as the World-Wide-Web along with thousands of ftp sites that render documents, graphic pictures, images, audio clips, and full-motion video available on the Internet.

Appx949; *see also* Appx952 (teaching that there is no seek latency because "all files are stored contiguously" on the disk).

Substantial evidence thus supports the Board's finding that an ordinary artisan would have combined Medin and Seltzer despite CA's assertion that file systems are "inappropriate for a web caching system."

### E. The Board Correctly Found that the Combination of Medin and Markatos Teaches Maintaining Network Objects Independently of a File System for Mass Storage

The Board held that the combination of Medin and Markatos renders claim 17 of the '794 patent obvious. Appx24-28. The Board held that Markatos teaches

the "wherein" limitation of claim 17—"wherein said step of maintaining is performed independently of a file system for said mass storage"—because Markatos teaches maintaining frequently accessed documents in main memory to avoid delays associated with using the mass storage file system. Appx26-28. The Board held that an ordinary artisan would have been motivated to apply the main memory web caching of Markatos to the improve the performance of the caching servers of Medin. *Id.*

CA does not dispute the motivation to combine the teachings of Medin and Markatos. *See* CA Br. 56-70. CA also does not dispute that Markatos teaches maintaining up to 90% of network objects in main memory independently of a server's mass storage file system. *See* CA Br. 58-62. Instead CA argues that Markatos does not teach the "wherein" limitation of claim 17 because Markatos teaches that at least 10% of network objects are retrieved from mass storage using a file system. *See id.* at 63. As the Board held, CA's argument fails because it conflicts with the language of claim 17.

#### 1. Claim 17 requires maintaining "a set of network objects" independently of a mass storage file system

CA's argument is based on the premise that claim 17 requires storing "all" network objects—i.e. 100% of the objects that are cached—"solely" without using the mass storage file system. *See* CA Br. 63, 70. CA provides the most recent articulation of its position as:

> [I]n the context of claim 17, limitation [c] does in fact require maintaining "all" of the recited "said network objects" independently of a file system for the mass storage, not just "a set" (e.g., some) of the recited "said network objects," as the Board improperly concluded.

CA Br. 70.

CA's interpretation of claim 17 disregards the actual language of the claim, which expressly concerns caching "a set of network objects," and only requires maintaining those same network objects—i.e., "said network objects"—"independently of a file system." *See* Appx26-27. In particular, the first limitation of claim 17 requires "receiving a set of network objects." Appx45 (18:11-12). That "set of network objects"—i.e., "said network objects"—must be maintained in a cache memory. *Id*. (18:13-16). Pursuant to the wherein clause, that step of maintaining—i.e., maintaining the "set of network objects"—must be "performed independently of a file system for said mass storage." *Id*. (18:17-18). Claim 17 does not recite or require maintaining "all" sets of network objects independently of the mass storage file system, nor does it speak to how **other** network objects besides the recited "set of network objects" may be maintained in the cache engine's cache memory.

CA's argument is also veiled attempt to introduce a negative limitation into claim 17—that the cache engine cannot maintain any network objects using a mass storage file system. Based on this imaginary negative claim limitation, CA seeks to

read out disclosures, such as Markatos, that teach maintaining "a set of network objects" independently of the mass storage file system because those disclosures would also permit maintaining other network objects using a file system. CA's arguments contravene longstanding authority from this Court that, in order to teach the steps of a claimed method, the prior art need not always or exclusively perform the method. Rather, "[i]t is enough that the combination would sometimes perform all the method steps." *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1002 (Fed. Cir. 2016); *see also Software Rights Archive, LLC v. Facebook, Inc.*, 659 Fed. Appx. 627, 642 (Fed. Cir. 2016) ("The fact that they do not in all cases mandate the use of [the step of the method] does not mean that they do not teach the [step]."). As such, if Markatos teaches performing the method of claim 17 with respect to any set of network objects, that is sufficient to render the claim obvious, even if Markatos performs a different method with respect to other sets of network objects.[6] *See* Appx3020-3021, Appx3030-3031.

#### 2. CA's interpretation of claim 17 contradicts the specification and the position CA advanced in the district court

CA's interpretation of claim 17 also conflicts with the specification of the '794 patent and the position that CA advanced in the district court.

---

[6] To be clear, Markatos does not teach maintaining only one set of network objects independently of the mass storage file system. As CA admits, Markatos teaches maintaining up to 90% of all objects in the main memory independent from the mass storage file system. Appx2797-2799.

As to the specification, the main memory web caching technique of Markatos closely tracks embodiments of the ’794 patent where the cache engine maintains some of the network objects in volatile memory, while maintaining other objects in mass storage. For example, the ’794 patent states that “[a] subset of the blocks 200 are maintained in the memory 103, so as to use the memory 103 as a cache for the mass storage 104.” Appx40 (8:9-11). Like Markatos, the ’794 patent states that this technique is intended to “maintain those blocks 200 in the memory 103 which are most frequently accessed.” Appx41 (10:28-29). In seeking to distinguish the teachings of Markatos, CA entirely ignores these parallel teachings from the specification of the ’794 patent. *See* CA Br. 56-70.

CA also took the position in the district court that storing frequently-accessed objects in virtual memory satisfies the “wherein” limitation of claim 17. Indeed, CA argued that Netflix infringes claim 17 because, on Netflix servers, “[p]opular files are locked into memory rather than fetched constantly from disk” to avoid “disk I/O being the cause of a server capacity bottleneck.” Appx3085-3086. CA’s current argument that “all” network objects must be maintained independently of the mass storage file system thus directly contravenes the specification of the ’794 patent and CA’s position before the district court that maintaining frequently-accessed objects in main memory falls within the scope of the claimed invention.

### 3. Substantial evidence supports the Board's finding that Markatos teaches maintaining a set of network objects independently of a mass storage file system

Stripped of CA's improper interpretation of claim 17, substantial evidence supports the Board's determination that Markatos teaches maintaining "a set of network objects" independently of a file system for mass storage. Indeed, Markatos expressly teaches that many sets of network objects—indeed, up to 90% of all web documents—are maintained in main memory independently of the mass storage file system:

> In this paper we propose and explore Main Memory Caching of frequently requested Web documents on the Web server's memory. That is, **if a document is frequently accessed, then it is kept in the Main Memory Cache, inside the Web server's address space. The server accesses its own cache directly, without any help from the file system**. When a client requests a document that resides in the server's main memory cache, the document is directly read from the server's cache and sent to the client without making any file system calls to access the document.

Appx908.

CA complains that the Board failed to define "a set of network objects" in the FWD. CA Br. 68. But the parties never disputed the meaning of "a set of network objects" and CA never asked the Board to construe the term. The '794 patent states that the network objects "include data, such as HTML pages, text, graphics, photographs, audio, video[.]" Appx39 (6:30-36). This is precisely the

type of data that Medin teaches caching—multimedia webpages that would include, for example, "a headline story including text, an image, and video footage." Appx870 (12:29-34). Dr. Houh opined that "a POSITA would understand the multimedia content requested in Medin qualifies as a 'set of network objects.'" Appx765-766 (¶129). CA never disputed that assertion and raises the definition of "a set of network objects" for the first time (in passing) on appeal. CA Br. 68. As such, any argument that the combination of Medin and Markatos would not maintain "a set of network objects" in main memory independently of the mass storage file system has been waived. *See Acoustic Tech., Inc. v. Itron Networked Sols., Inc.*, 949 F.3d 1360, 1366 (Fed. Cir. 2020) ("Because Acoustic never presented to the Board the non-obviousness arguments it now raises on appeal, we find those arguments waived."); *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435 (Fed. Cir. 2015) ("[I]t is important that the applicant challenging a decision not be permitted to raise arguments on appeal that were not presented to the [PTAB]." (citing *In re Watts*, 354 F.3d 1362, 1367 (Fed.Cir.2004)).

## VI. CONCLUSION

The Board's decision should be affirmed.

Dated: November 27, 2023

Respectfully submitted,

*/s/ Harper S. Batts*

SHEPPARD MULLIN
RICHTER & HAMPTON LLP
Harper S. Batts
*hbatts@sheppardmullin.com*
Christopher S. Ponder
*cponder@sheppardmullin.com*
Jonathan DeFosse
*jdefosse@sheppardmullin.com*
Jeffrey Liang
*jliang@sheppardmullin.com*
1540 El Camino Real, Suite 120
Menlo Park, CA 94025
Telephone: 650.815.2600
Facsimile: 650.815.2601

*Counsel for Appellee Netflix, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1). This brief contains 13,177 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: November 27, 2023

Respectfully submitted,

SHEPPARD, MULLIN,
RICHTER & HAMPTON LLP

*/s/ Harper Batts*
Harper Batts

*Counsel for NETFLIX, INC.*